ELLA · SANDERS, Claimant, *v.* STATE OF NEW YORK, Defendant.
(Claim No. 28116.)

Court of Claims, December 31, 1947.

*John W. Miles* and *Charles C. Congdon* for claimant.

*Nathaniel L. Goldstein, Attorney-General (Harold S. Coyne* of counsel), for defendant.

RYAN, J. The Barge Canal flows in an easterly direction through the town of Palmyra, Wayne County, and, near the village of Palmyra, parallels the northerly village line which lies about 150 feet to the south of the channel. Maple Avenue, in the village, runs from the south to the village line and,

crossing over the canal, continues to the north as a county highway commonly called by the same name it bears in the village. The bridge over the canal prism is a fixed structure, 150 feet long and 18.8 feet wide, of steel girders on concrete abutments with floor planking laid diagonally. There is no complaint made about the design, construction or maintenance of the bridge proper.

When the Barge Canal was built the State of New York acquired the fee of two adjoining parcels of land lying to the north of the canal. Upon these a fill was placed for the north approach to the bridge which is by way of a concrete highway, 18 feet wide, placed on the fill and maintained by the county of Wayne. The two parcels constitute a plot which is 300 feet long north and south and which extends about 30 feet beyond the highway on both the east and west sides. Beginning at the point at the northerly edge of the bridge where its wooden flooring adjoins the county highway, the highway surface has been covered with bituminous material, the last application of such material having been made in the latter part of June, 1945, by employees of the county. This black top covers 16 feet of the 18-foot width of the highway and extends 18 feet in depth north from the end of the bridge. Many pages of the transcript of testimony are taken up with question and cross question about this patch of black top, it being the contention of the claimant that there was a "bump" in it, 2 to 3 inches high, which measured 2 feet north and south and 4 to 4½ feet east and west and which was located west of the center line of the highway and immediately north of the bridge. Claimant's counsel urges that this "bump" was a causal factor in her accident and resulting injuries. The Attorney-General asks us to find that if a defect did exist there the State of New York was not responsible for it because the highway was maintained by the county and not by the State of New York. It is doubtful that the State could thus escape responsibility for a defect in the surface of the vehicular approach to its canal bridge, if one existed and was the cause of an accident. Moreover, in view of the trend of decisions, the thought occurs that our jurisprudence may yet spread the ever widening waiver of governmental immunity from tort liability to the point where the State will be held to answer in damages for the acts of the employees of its civil divisions. Up to now, such an argument has been rejected as vain. (*Bernadine* v. *City of New York*, 294 N. Y. 361.) Here, we settle the question by a finding, supported by the preponderance of evidence, that **no such defect existed on the day of claimant's accident.**

Claimant sues the State of New York for injuries she sustained on October 24, 1945. On that day there were wooden guardrails extending along the east and west shoulders of Maple Avenue north of the bridge for a distance of 300 feet. These had been erected and were maintained by the State of New York. At about 9:30 o'clock in the morning claimant was operating a 1941 Ford V-8 two-door sedan, owned in common with her sister. She drove from the Main Street office of her employer, the Garlock Packing Company, to its Maple Avenue office, which is located about 150 feet south of the bridge and just inside the village. She stopped there but there was no place to park so she proceeded across the bridge for the purpose of going to the intersection of Maple Avenue with Quaker Road, north of the bridge, intending to turn around there and come back. Claimant testified that her approximate speed as she was going across the bridge was " not more than 20 miles, because I had just started "; that she had started from " a standing stop "; that " I think I was in second ". Claimant's testimony was not controverted by any other witness and the Attorney-General does not argue that high speed could be deduced from what happened to the motor vehicle which she was operating. On the contrary, he requests the court to find as a fact that claimant was traveling in second gear at twenty miles per hour. Upon this request, which we adopt, the issue of excessive speed as a contributory cause of the accident is removed from our consideration.

It had been raining on the morning of claimant's accident and the flooring of the bridge was wet. There was no traffic going either southerly or northerly on the bridge at the time claimant was driving her car northerly over it. She was traveling on the easterly portion and when at a point approximately three quarters of the way across the bridge her car skidded to the west side of it. She had her foot on the accelerator at the time her car started to skid and she did not apply her brakes but tried to straighten the car by pulling the steering wheel to the right or towards the east. The car went out of control and traveled about 29 or 30 feet north of the northerly end of the bridge at which point it left the highway, went through the wooden guardrails on the westerly side thereof and down an embankment to the adjoining fields.

The Attorney-General requests the court to find as a fact that " The claimant failed to produce evidence sufficient to establish that the skidding of her car on the bridge was caused by lack of reasonable care on the part of the State, its officers,

agents or employees." This request we adopt. There is no proof of inadequate or negligent design, construction or maintenance of the bridge itself.

The Attorney-General also requests the court to find as a fact that "The sole producing cause of this accident was due to [*sic*] the careless, negligent and reckless operation of the car by the claimant causing said car to skid on the flooring of the bridge." This request we refuse. The cause of the initial skid on the bridge has not been explained. The fact that her auto skidded while proceeding on a wet wooden bridge at twenty miles per hour does not, in and of itself, impute negligence to claimant. (*Lahr* v. *Tirrill*, 274 N. Y. 112 [1937]; *Hammond* v. *Hammond*, 227 App. Div. 336 [1929].) Nor does the fact that it thereafter went out of control necessarily imply that she was careless in operating it. Perhaps another driver would have applied his brakes; or yet another would have pulled to the left instead of to the right. We can only guess that the result would have been different. The test is one of competency, not of the degree of skill. (*Smith* v. *Levison*, 222 App. Div. 310 [1928]; *Sporborg* v. *State of New York*, 226 App. Div. 113 [1929].) It does not appear that the emergency was of claimant's creation. Once it arose we find nothing in the record to support a finding that anything she did, or omitted to do, caused or contributed to her injuries.

Did any act or omission on the part of the defendant cause them? The issue narrows to this: Was it the duty of the State of New York to provide and maintain a barrier which would have held claimant's automobile? If we apply the principles enunciated by Judge POUND in *Roberts* v. *Town of Eaton* (238 N. Y. 420, 422–423 [1924]), the answer is clearly " no ". This on the theory that defendant was required only to " erect such a railing, if any, as would be a sufficient protection for travel generally ", not one " sufficiently strong to hold a heavy car [3000 pounds] from going over such a declivity." But in twenty-three years the appellate courts have so broadened the interpretation of " ordinary care " that " the rule of * * * reasonableness " seems now advanced almost to that " field of insurance against accidental injury or death " which the late Chief Judge contemplated from afar. The decision in *Best* v. *State of New York* (203 App. Div. 339 [1922], affd. 236 N. Y. 662) was cited in support of the decision in the *Roberts* case (*supra*) and both authorities were followed in *Cotriss* v. *State of New York* (223 App. Div. 520 [1928]) and in *Carner* v. *Town of East Greenbush* (225 App. Div. 609 [1929]). But the

germ of an idea first expressed in the *Per Curiam* opinion in the *Carner* case (*supra*) was nurtured in *Countryman* v. *State of New York* (251 App. Div. 509 [July, 1937]) and came to full maturity in *Huston* v. *County of Chenango* (253 App. Div. 56 [Dec., 1937], affd. 278 N. Y. 646).

In the *Carner* case (*supra, p.* 611) a verdict against a town which was based on the town's failure to maintain a sufficiently strong barrier was reversed in the following language: "So the liability of the town rests on its failure to maintain a barrier sufficiently strong to stop a truck suddenly turned against it. Before the advent of the automobile, barriers were intended chiefly to indicate the presence of danger and to arrest the progress of a horse straying from the beaten path of the highway. Now conditions no doubt demand greater responsibility and care. It may be that the State in constructing main highways principally for travel by automobile, should be required at places of unusual danger to locate barriers to stop and hold such a vehicle proceeding at a reasonable rate of speed. But a town is not charged with that duty in relation to its common dirt roads."

In the *Countryman* case (*supra*) a dismissal, based upon failure to establish facts sufficient to constitute a cause of action, in which the Court of Claims (159 Misc. 846, 848) commented " to make a finding that the guard, if brand new, would have held the Countryman automobile would be pure speculation " and citing the *Best* case (*supra*) and also *Dorrer* v. *Town of Callicoon,* 183 App. Div. 186 [1918]), was reversed. The Appellate Division (p. 512) while reaffirming the long recognized doctrine that the " State or a municipality is required to erect a barrier which will furnish reasonable protection ' for travel generally' ", nevertheless expanded the thought expressed in the *Carner* opinion (*supra*) to a holding that (p. 513): " A sound barrier rather than a decayed one might or might not have averted this particular accident, but the failure of the employees of the State to make replacement of decayed posts indicated an indifference toward the protection of the public at a place obviously dangerous. * * * This failure was actionable negligence " and remitted the matter with a direction to fix damages. Thereafter the Court of Appeals answered affirmatively the question certified, which was: " Did the claimants as a matter of law make out a case warranting judgments against the State? " (277 N. Y. 586, 588.)

In the *Huston* case (*supra*) plaintiffs' intestate, a girl fourteen years old, was drowned when an automobile in which she

was a passenger went off a county road along the south bank of the Susquehanna River. At the point of the accident the highway had a 12-foot wide macadam pavement. Along the river side was a 3-foot grass-and-weedy shoulder and then a bank which sloped 22½ feet in 37½ feet to the water's edge. There were no guardrails or other barriers between the edge of the macadam and the water. There had been a sleet storm in the afternoon. The accident occurred shortly after 7:30 P.M. on an October evening. The automobile was found upright and completely submerged in the river. Mr. Justice BLISS (253 App. Div. 56, 59–60) said: "While the general principles governing liability as stated in the *Roberts* case are just as true today as they were when enunciated, conditions of travel have changed greatly since   *   *   *   A railing which in 1921 would have been a sufficient protection for travel generally would not be such today.   *   *   *   A factual situation which would then have been held as matter of law to have created no liability on the part of the municipality would not serve as a norm today."

More recently the same Justice of the Appellate Division wrote the prevailing opinion in *Mason* v. *Town of Andes* (261 App. Div. 354 [1941], affd. [Chief Judge LEHMAN dissenting] 287 N. Y. 616). In this case a poorly equipped model A Ford truck, not in good mechanical condition, with tires smooth and much worn and with evidence that with all its brakes fully applied any of its wheels could be freely moved by hand, was driven by a nineteen-year-old boy on a back-country dirt road in the Catskills. The driver was proceeding down grade in second gear at from ten to fifteen miles per hour and when he attempted to drive toward the right side of the road the automobile slid over the edge of the embankment and was precipitated some 30 feet to the creek bed below. The defendant had at one time placed a log barrier along the edge of the beaten trail of the road but on the day of the accident there was no barrier between the road and the top edge of the bank. Verdicts for plaintiffs which had been set aside as against the weight of evidence and contrary to law (15 N. Y. S. 2d 834) were reinstated by the Appellate Division. Here Mr. Justice BLISS said (pp. 354–355): "There can be no longer a doubt that under proper circumstances reasonable protection of the public travelling upon a town, county or State highway may require at dangerous points the erection and maintenance of adequate barriers to both warn and guard and that the absence of such a barrier may be negligence."

Along the same line, although the victim of the accident was not a driver nor a passenger in an automobile but a child propelling a bicycle, is the case of *Garrow* v. *State of New York* (268 App. Div. 534 [1944], affd. 294 N. Y. 741). Mr. Justice HEFFERNAN said (p. 538): "The bridge in question was erected twenty-seven years prior to the death of claimant's intestate. Since then traffic conditions have radically changed. A parapet which in 1916 would have afforded sufficient protection to the traveller would hardly be adequate today. * * * In view of the growth of traffic it was defendant's duty in the interests of public safety to make such alterations in the structure of the bridge as would accord with changed conditions."

As authority for his above-quoted statement the learned Justice cites *Sturman* v. *New York Central R. R. Co.* (280 N. Y. 57 [1939]). In that case a judgment affirming a dismissal of the complaint was reversed and a new trial ordered. It is noteworthy because the plaintiff therein had previously recovered a judgment in the Court of Claims which had been set aside upon a finding, by the Appellate Division, that the sole proximate cause of the accident was the failure of the driver of the car in which she was riding to heed warning signs placed by the State. (See *Sturman* v. *State of New York*, Claim No. 21896 [1934], revd. 244 App. Div. 865, affd. 269 N. Y. 627.) The *Garrow* and *Sturman* cases (*supra*) confirm the trend of the decisions.

Here we are not dealing with a State highway and we are not concerned with any possible liability of the county of Wayne of which we have no jurisdiction. The question before us involves the duty of the State of New York to travelers over its canal bridges who, as the responsible State employees must know, now proceed mainly by high-powered motor vehicles whether they approach the canal by way of a State route or by way of a county or town road. The principles of liability to be applied are found in the authorities hereinabove reviewed. The evidence here is that the posts which were part of the guardrail were set on the brink of the slope and that there was no horizontal backfill to support them; that one of the posts was broken off by the impact of claimant's automobile; that this post was discolored, pitted and in process of decay; that another post was pushed out of the ground by the impact of claimant's car; that it was not broken; that the bottom part of it, upon examination at the trial, did not show signs of having been treated with creosote; that the outer layer of wood had been rotted off and the lower third of the post was lesser in diameter than the upper two thirds. Thus the State of New

York failed in its duty to provide and maintain at the site of the accident a sound and adequate barrier. We find liability herein upon that sole ground. As claimant's injuries were caused in whole or in part by the unsafe, defective and decayed condition of the guardrails and as she was, as we have already said, free from contributory negligence, she is entitled to recover herein.

Claimant's injuries were severe, disfiguring and permanent. The most serious were inflicted by a piece of the wooden guardrail which entered the open window of claimant's automobile, struck her face and then broke through the windshield from the inside. This caused a comminuted fracture of the left upper jaw bone which extended from the ridge of the teeth to the lower margin of the orbit of the eye, the wounds extending into the maxillary sinus, and the laceration being so extensive that all of the underlying bones were exposed to view and the anatomy of the face was completely exposed. There was resulting considerable hemmorhage of the eyeball and the tissues surrounding it and a paralysis of the seventh nerve which supplies the motor action to the face. Claimant's vision has been impaired and a cataract is beginning to form. She has lost the use of her left eye and has lost her binocular vision and perception of depth and space. It may be necessary to remove the cataract when it becomes mature in order to prevent secondary glaucoma or hardening of the eyeball from development. The left orbit of the eye has been depressed into the antrum and a plastic operation or any attempt to perform an operation to place the eye in a better position is not recommended.

Claimant is fifty-seven years of age. At the time of the accident she was doing general clerical work and, including bonuses, was earning $2,113.75 a year. She returned to her employment five weeks and three days after the accident. She has already expended large sums of money for medical, surgical, hospital and nursing care, and other incidentals, and will have future expenses for medicines and perhaps for surgery. The repair of the automobile cost $381.70 for one half of which the claimant was liable. Claimant pleaded various items of special damages but the proof was at variance with them in some instances and the record discloses no motion to conform. However, claimant's requests do not detail these items but ask only for a lump sum award and there being ample evidence in the record to guide the court in reaching a decision in this respect we act accordingly. Findings of fact are now adopted as appears in an accompanying decision and upon them we award claimant the sum of $18,000.